# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TUE XIONG, | ) | 1:05-CV-1230 LJO JMD HC |
| | ) | |
| Petitioner, | ) | |
| | ) | FINDINGS AND RECOMMENDATION |
| v. | ) | REGARDING PETITION FOR WRIT OF |
| | ) | HABEAS CORPUS |
| | ) | |
| MARK SHEPHERD, | ) | ORDER DIRECTING CLERK OF COURT |
| | ) | TO CHANGE NAME OF RESPONDENT |
| Respondent. | ) | |
| ————————————————— | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno.  In June and July 2000, Petitioner was convicted by a jury of several sex and gang related offenses.  (Answer at 1.)  On January 8, 2001, the trial court sentenced Petitioner to a prison term of twenty-four years, eight months. (Answer at 1-2.)

On January 8, 2001, Petitioner appealed to the California Court of Appeal.  On November 24, 2003, the court reversed the judgment in part and remanded for resentencing.  (Answer at 2; Lodged Doc. 3.)  On October 15, 2004, Petitioner was sentenced to eighteen years in prison.  (Answer at 2; Lodged Doc. 8.)

1    On January 5, 2004, Petitioner petitioned the California Supreme Court for review.  On

2  March 17, 2004, the court denied review.  (Answer at 2; Lodged Docs. 4-5.)

3    On September 29, 2005, Petitioner filed the instant petition in this Court.  The petition raises

4  the following five grounds for relief: 1) the trial court erred by refusing Petitioner's request to

5  specifically define the element of "force" for purposes of rape; 2) insufficient evidence to support

6  Petitioner's conviction for attempted rape and attempted rape in concert; 3) the imposition of

7  consecutive sentences was unconstitutional because the jury made no finding that the offenses were

8  committed against separate victims or on separate occasions; 4) Petitioner's right to a fair trial was

9  violated by several statements made by the prosecutors to the jury during closing argument; and 5)

10  jury instruction defining "proof beyond a reasonable doubt" violated due process by reducing the

11  prosecution's burden of proof.

12    On June 19, 2007, Respondent filed an answer to the petition.

13                                **FACTUAL BACKGROUND**[1]

14  ———This Petition arises out of an investigation into allegations that members of a criminal street

15  gang, the Mongolian Boys Society (MBS), were sexually assaulting young Asian girls and forcing

16  some of them to engage in prostitution.  The individuals charged were members, former members, or

17  associates of MBS.[2]  The charges included a plethora of criminal offenses involving nine

18  victims–May, Annie, Pa, Cindy, Pangnhia, Judy, Fahm, Linda C., and Linda H.  Petitioner was found

19  guilty of 25 crimes involving four of the victims.

20    Crimes against May

22    On or about May 31, 1997, May (born in 1983) was invited to a party.  May sneaked out her

23  bedroom window and Scissors drove her and another girl to 007's house.  While she was there,

24  Anthony told May to have sex with 007.  May refused, telling him that she was a virgin.  Then Bolo

25  and Petitioner told May to have sex with Iron Man, who was her boyfriend.  May refused.  Petitioner

26  grabbed May by her arms and took her to a different room with a bed in it.  Iron Man came into the

[1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of November 24, 2003 and are presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 3.

[2] The individuals are referred to by their gang monikers.

1  room.  Petitioner told them to hurry and left the room.  Scissors and Petitioner came back into the

2  room and someone undressed May.  Scissors and Petitioner told Iron Man and May to hurry.  They

3  took May's clothes and left the room.  Iron Man told May to "hurry up and get it over with."  Iron

4  Man forced May to have sex with him for five or 10 minutes.  May "said for him not to do it."  She

5  tried to stop Iron Man, but he pushed himself on her.  After Iron Man ejaculated, he dressed and left

6  the room.  Then 007 entered the room.  May had wrapped herself in a sheet.  Petitioner came into the

7  room, took the sheet, and left.  007 had sexual intercourse with May for about 10 minutes.  She tried

8  to stop 007 by pushing against him and yelling "at him for being a child molest and a fat ass."  After

9  007 finished, he left the room.  Petitioner and Bolo came into the room.  Petitioner was naked and

10  his penis was erect.  He was sticking out his tongue and wagging it at May.  Bolo grabbed her from

11  behind.  Petitioner approached May and she bit him on the shoulder.  Petitioner remarked that his

12  penis had become "dead" and left the room.  Someone brought May's clothes back into the room.

13  She dressed and left the room.  Scissors drove May home.  Petitioner later threatened to beat her up

14  if she told anyone about what had happened at 007's house.

15      About a week after this assault, Scissors and Petitioner pressured May into coming with them

16  to another party.  While she was there, Anthony told her that she had "to go pimp," which means

17  "[w]hen someone has sex with an older guy for money."  He said that customers would pay $40 or

18  $60.  Bolo, Petitioner, Iron Man, and Scissors were present.  Petitioner and Iron Man told May that

19  they would beat her up if she refused to pimp.  Petitioner also threatened that "[h]e'll go home

20  invasion if I go home," which means "go shoot my whole family."  May felt like she had no choice

21  but to agree to engage in prostitution.  She got into a car with a Hmong man.  She tried to stop the

22  man from having sex with her by telling him that she was too young and did not want to have sex.

23  The man replied that he had "[p]aid Anthony."  May had sex with him.

24      After this event, May did not return home until mid-August.  During this two-month period,

25  May was "pimped out to paying customers" three to five times per day.  May never sought out

26  customers herself or negotiated with them.  She acted in response to orders given by Anthony,

27  Petitioner, Sim, and Iron Man.  Anthony appeared to be in charge of the prostitution activities.

28  When he was not present, Scissors talked to customers and took money from them.  May also saw

1   Iron Man, Petitioner, Bolo, and Sim interacting with customers.

2        In addition to engaging in prostitution, May had sex with Bolo, Petitioner, Iron Man, Money,

3   Scissors, and other MBS members during this period.  She orally copulated Anthony, Petitioner, Iron

4   Man, and Scissors.  On two occasions, MBS members had sex with May in succession.  This was

5   known as a "lineup" or a "Mongolian train."  The first time May was "lined-up" was during the

6   month of June in a Motel 6 room.  (MBS members often rented motel rooms in which groups would

7   congregate, engage in sexual activity, and conduct prostitution-related activities.)  Bolo and

8   Petitioner were among the participants.  May was "lined-up" again the following month in another

9   Motel 6 room.  Money was one of the participants.  Iron Man participated in one of the lineups.

10       May worked as a prostitute and engaged in sexual activities with MBS members because she

11  believed that she would have been beaten and "lined-up" if she refused.  She also believed Iron

12  Man's threat that he would harm her family.  She saw five MBS members including Sim, Petitioner,

13  and Iron Man beat up Annie.  She also saw Anthony, Petitioner, Iron Man, and Money handling a

14  handgun.  May described an incident in which she went to a shopping mall with a girl named

15  Gonhia.  When she returned, Money held a knife to May's neck and told her that if she ever went to

16  the store again he would kill her.  May did not go home because she believed that it would be

17  pointless; Petitioner, Anthony, and Bolo would come to her house and remove her.  Petitioner told

18  her, "if I was going to go, he would come right back and get me."

19       Crimes against Annie

20       Youa (born in 1983) is known as Annie.  Sometime in May or June 1997, she was socializing

21  with a group of MBS members when Sim told her that he wanted to pimp girls.  Annie argued back,

22  asking him why he could not respect girls the same way girls respect guys.  Sim did not respond.

23  Later that day, Sim approached her and he began punching her.  Petitioner, Iron Man, and three other

24  men joined in.  They punched her for about 30 seconds to one minute.  She fell to the ground and

25  Iron Man kicked her.  They bruised her face and body.  May and Judy saw Annie being beaten.  Judy

26  testified that Scissors also was punching Annie.

27       On another occasion, Annie was in a motel room with a group when Sim grabbed her by the

28

wrist and dragged her into the bathroom.  He told her to take off her pants.  When she refused, he

removed her jeans and underwear, pushed her onto the floor, and had sex with her.  Sim left the

bathroom.  After showering, Annie went back into the room and asked Sim if she could leave.  He

told her "no."

At the end of June, Annie was in a car with Scissors, Sim, Petitioner, and ET traveling to a

motel when Scissors pointed a handgun at her.  It looked like a .45-caliber weapon.  She went into

the motel room with them because she felt that she did not have a choice.  She was afraid of them

and did not want to be "shot by them or anything."  Annie sat on the bed for a while, drinking and

watching television.  Scissors grabbed her by the wrist and took her in the bathroom.  He removed

her pants and underwear and forced her to have sex with him.  She tried to push him away but "[h]e

kept on coming back."  She stayed in the motel room until the next morning and then she went

home.  She did not try to leave the motel room immediately after Scissors raped her because she

knew that they would not allow her to leave or take her home because she had not been permitted to

leave the room after Sim had raped her.

Crimes against Pa

On the evening of Friday, July 18, 1997, Pa (born in 1982) went to a motel room with Money

and two other MBS members.  She could not get a ride home and so she slept in the motel room.

The next morning, she went to another motel room where a group had congregated.  Pa was

pressured by two girls to have sex with Scissors.  Scissors undressed Pa and had sex with her.  He

held her by her arms or hands.  Afterwards, Money told Pa to go to the bathroom.  She refused.  He

said, "You have to listen to us," and told her that if she did not go to the bathroom, they might have

to take her by the hand or carry her.  Pa went into the bathroom.  She took a shower because she was

bleeding from the vagina.  Petitioner entered the room.  He had sex with Pa on the bathroom floor.

Then Money entered the bathroom and he had sex with her.  She did not agree to have sex with any

of these three men.  Pa remained with MBS members until Tuesday.  At one point, she was in a

motel room with a group of MBS members and girls when she saw a man give $70 to Scissors.

After Scissors counted the money, he asked the man to choose the girl with whom he wanted to have

sex.  May, Cindy, and Naly were in the room.  The man pointed to Naly and then he took her outside

to his car.

Crimes against Cindy and Pangnhia

One day in January 1997, Pangnhia and Cindy (both born in 1983) went to visit a friend.  A group of men that included Petitioner was at the friend's house.  Pangnhia and Cindy went with this group to Snuk's house.  Four to six men were inside Snuk's house; Cindy recognized Iron Man among them.  The girls went into a bathroom that was reached through a bedroom.  When they came out, several of the men were standing in the bedroom.  They gang raped the two girls.

Pangnhia testified that Beetle grabbed her by the hair and pulled her down to the floor.  She started yelling.  Someone told her to stop yelling because the neighbors would hear.  Someone removed her pants.  First Bee and then Petitioner had nonconsensual sex with Pangnhia.  After Petitioner was finished, Iron Man said "that he wanted to go next or else he's not going to go at all." Iron Man got on top of Pangnhia and had sex with her.  Beetle pinned one of Pangnhia's arms to the ground.  Pangnhia asked Petitioner and Iron Man how they could do this to her because they were friends with her brother.  Neither man replied.  When Iron Man finished, four other men forced Pangnhia to have sex with them.  Cindy testified that Poker pulled her to the floor.  Iron Man held down her hands.  Cindy "told them to stop it."  Either Iron Man or Poker took off her pants.  Poker had sex with Cindy, despite her pleas for him to stop.  She tried to kick him but someone held her legs down.  Afterwards, Cindy was raped by another man.

In early summer 1997, Cindy was in front of a friend's house when Anthony and Boon Mee drove up.  Boon Mee grabbed Cindy by the hand and forced her to get into Anthony's car.  They went to a barbecue where she was initiated into MBS's female auxiliary group, the Mongolian Society Girls (MSG).  Cindy did not return home for the next three months.  During this time, she stayed in various motel rooms and with Gonhia.

One day during that summer, Cindy was in a Best Budget Motel room.  Anthony took her into the bathroom, removed her pants, and forced her to have sex with him.  She told Anthony that she did not want to have sex with him, tried to push him off her, and told him to stop.  After Anthony finished, he left the bathroom.  Bolo came in the room.  Bolo indicated that he wanted to have sex

with her.  When she said no, Bolo replied that "he was just playing" and left the bathroom.  Then Sim came into the room.  After unsuccessfully trying to touch her breasts and to remove her pants, he left the room.  Iron Man entered the bathroom and he forced her to have sex with him.  Cindy tried to push him away and she told him to stop.

Crimes against Judy

Judy (born in 1983) testified that she ran away from home in May 1997 and was gone for "[a]lmost a month."  She stayed at various houses and motels.  Judy was "pimped out" during this period.  The customers paid Anthony; Judy did not receive any of the money.  She did not plan to be gone so long but she was afraid to return home "[b]ecause Money say that if we go home, then he'll come back and kick our ass."  Judy saw a handgun at the motel and thought that Petitioner and Scissors would kill her if she left.  Also, Scissors cut off a piece of her hair and Judy was scared that he was going to bury it.  In the Hmong culture, cutting a person's hair is threatening because "they say that if you bury a human hair, then you could die the next day."  Scissors eventually drove Judy home because there was no more money and she "didn't want to go pimp for them any more."

Judy was in a motel room one day during this month when Anthony got on top of her and tried "to rape [her]."  He touched her breasts and vagina under her clothes.  Judy told him to stop and tried to push him away but he continued touching her for 15 to 30 minutes.

Judy was driven to 007's house the following day.  Anthony told her to have sex with 007.  She refused.  He took her hand and led her into another room.  He told her to undress.  When Judy refused, Anthony undressed her and then hid her clothes.  007 came into the room, sat on top of Judy, touched her breasts and vagina and forced her to have sex with him.  Judy tried to push 007 off her and told him to stop but he did not listen.  After about 10 minutes, Judy was able to push 007 off her.  She asked Scissors to bring her clothes back, which he did.  She dressed and left the room.

Scissors drove Judy to another house.  While they were there, Petitioner touched her breasts and vagina under her clothes.  She told him to stop but he did not comply.

Eventually, Judy returned to 007's house with a group that included Annie and May.  Scissors and Anthony wanted them "to go pimp."  Judy refused.  Nonetheless, two men between the ages of

60 to 70 arrived to pick up Judy, May, and Annie.  The girls did not want to go with the two men.
Scissors told them to go with the men "or else he'd kick our ass."  The three girls got into a car with
the two men.  Judy and May told the men that they did not want to be with them and so they dropped
off the girls at Iron Man's house.  Inexplicably, Scissors became angry with the two men and said that
he wanted to pull a gun on them.

Judy went to a motel with a group that included Anthony, Petitioner, and Money.  She drank
some beer.  Petitioner started touching Judy's breasts and vagina.  She walked with Petitioner into the
bathroom.  He told her to undress.  Judy refused and so Petitioner undressed her.  Petitioner sat on
the toilet.  He made Judy sit on top of him and they had sex for about 10 minutes.  Judy twice told
Petitioner to stop but he did not comply.

The following day, Judy went to 007's house.  Judy was talking with Annie and May when
Anthony approached them and told Judy to pimp.  She refused.  He said, "if I don't go pimp, there's
no way we'll ever go home."  The three girls walked away from him.  Then Money approached them
and demanded that they go pimp.  They told him that they did not want to pimp and went to talk with
007.  Anthony approached them again and said that he wanted to talk with Judy.  Judy went with him
into another room.  He told her to take off her clothes.  Judy refused.  Scissors entered the room.
Someone undressed Judy and took her clothes out of the room.  Scissors forced Judy to have sex
with him for approximately 10 minutes.  She told him to stop and pushed him.  After Scissors
finished, Judy asked Anthony to return her clothes.  He refused.  007 entered the room.  He touched
Judy's breasts and vagina for about five minutes.  He wanted to have sex with her but she did not let
him.  Judy's clothes were returned and she was allowed to leave the room.  Judy talked to Annie for a
few minutes and then Annie was taken "to go pimp" with "an old man."

Sometime during this month, Judy was at 007's house talking with May and Annie when
Anthony entered the room.  The two girls left and Anthony told Judy to remain.  He began kissing
her and removed her clothes.  He inserted his penis into Judy's vagina a couple of times.  He held her
down on the ground with his hands.  She told him to stop.  He complied and walked out of the room.

**DISCUSSION**

**I.  Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 2241(d).  Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at

1    70-71; see Williams, 529 U.S. at 413.

2         As a threshold matter, this Court must "first decide what constitutes 'clearly established

3    Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71,

4    quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court

5    must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time

6    of the relevant state-court decision."  Id., quoting Williams, 592 U.S. at 412.  "In other words,

7    'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set

8    forth by the Supreme Court at the time the state court renders its decision."  Id.

9         Finally, this Court must consider whether the state court's decision was "contrary to, or

10   involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

11   quoting 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant

12   the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

13   question of law or if the state court decides a case differently than [the] Court has on a set of

14   materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

15   "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court

16   identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

17   that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

18        "[A] federal court may not issue the writ simply because the court concludes in its

19   independent judgment that the relevant state court decision applied clearly established federal law

20   erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A

21   federal habeas court making the "unreasonable application" inquiry should ask whether the state

22   court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

23

24         Petitioner has the burden of establishing that the decision of the state court is contrary to or

25   involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle,

26   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

27   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

28   decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.

1  1999).

2      AEDPA requires that we give considerable deference to state court decisions.  The state

3  court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's

4  interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), cert. denied,

5  537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

6  **III.  Review of Petitioner's Claims**

7      **A.  Ground One**

8

9      Petitioner argues that the trial court erred in refusing to instruct the jury as to the legal

10  meaning of "force" for purposes of defining rape.  The jury was instructed that the crime of rape

11  required that sexual intercourse be accomplished "by means of force, violence, duress, menace, or

12  fear of immediate and unlawful bodily injury to the alleged victim or to another person."  (Lodged

13  Doc. 2 at 11378-79.)  Petitioner requested that the jury be instructed that "[t]he term 'force' means

14  physical force that is substantially different from or substantially greater than that necessary to

15  accomplish the sexual intercourse itself."  (Lodged Doc. 1 at 3668.)  The trial court declined to give

16  the requested instruction.  (Lodged Doc. 2 at 10222-25, 11377-79.)

17      This claim was presented in an appeal to the California Court of Appeal, which affirmed the

18  relevant portion of the judgment on November 24, 2003.  (Lodged Doc. 3.)  The issue was then

19  raised in a petition to the California Supreme Court, which summarily denied review.  (Lodged Docs.

20  4-5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have

21  denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v.

22  Nunnemaker, 501 U.S. 797, 803 (1991).

23      In rejecting Petitioner's claim, the Court of Appeal found that the definition of force, as used

24  in Penal Code section 261(a)(2), is within the common understanding of jurors.  The failure to

25  specifically define it was therefore not error and, even assuming it was, the error was harmless.

26  (Lodged Doc. 3 at 22-24.)

27      A challenge to a jury instruction solely as an error under state law does not state a claim

28  cognizable in a federal habeas corpus action.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To

obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process.  Id. at 72.  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Id.  Furthermore, even if it is determined that the instruction violated due process, a petitioner can only obtain relief if the instruction "had substantial and injurious effect or influence in determining the jury's verdict."  Hanna v. Riveland, 87 F.3d 1034, 1039 (9th Cir. 1996).

Here, Petitioner only asserts that the failure to instruct the jury as to the definition of "force" was error, not that it violated any federal constitutional right.  Federal habeas corpus relief is therefore unavailable.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Assuming Petitioner is asserting a violation of his due process rights by virtue of the exclusion of the special definition of "force," his claim nonetheless lacks merit.  The instructions as given did not so infect the entire trial that the resulting conviction violated due process, as the definition of the term "force" as used in the rape statute is commonly understood.  See People v. Griffin, 33 Cal.4th 1015, 1022-23, 1028 (2004) (finding that the meaning of "force," as used in the rape statute, is commonly understood and that the trial court therefore had no duty to specially define it); U.S. v. Hernandez-Escarsega, 886 F.2d 1560, 1571-72 (9th Cir. 1989) (stating that no special definition is needed for words and phrases in statutes unless they are outside the common understanding of jurors, technical, or ambiguous).  Further, Petitioner has not shown that the trial court's failure to specially define "force" had a substantial and injurious effect or influence in determining the jury's verdict.

**B.  Ground Two**

Petitioner claims that there was insufficient evidence to establish that he intended to have sexual intercourse with May against her will.  Petitioner argues that his convictions for attempted rape and attempted rape in concert must therefore be reversed.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the relevant portion of the judgment on November 24, 2003.  (Lodged Doc. 3.)  The issue was then raised in a petition to the California Supreme Court, which summarily denied review.  (Lodged Docs. 4-5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have

1   denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v.

2   Nunnemaker, 501 U.S. 797, 803 (1991).

3        In rejecting Petitioner's claim, the Court of Appeal found that there was adequate testimonial

4   evidence to conclude that Petitioner attempted to rape May and that the sexual assault on May was a

5   group effort in which Petitioner acted in concert with other gang members.  (Lodged Doc. 3 at 47.)

6        A federal habeas court reviews sufficiency of evidence claims by determining "whether, after

7   viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

8   have found the essential elements of the crime beyond a reasonable doubt."  Lewis v. Jeffers, 497

9   U.S. 764, 781 (1990); Jackson v. Virginia, 443 U.S. 307, 318-19 (1979).  "[T]he standard must be

10   applied with explicit reference to the substantive elements of the criminal offense as defined by state

11   law."  Jackson v. Virginia, 443 U.S. 307, 324 n.16 (1979).

12        "Forcible rape is an act of sexual intercourse accomplished with a person not the spouse of

13   the perpetrator against the person's will by means of force or violence.  An attempt to commit rape

14   has two elements: the specific intent to commit rape and a direct but ineffectual act done toward its

15   commission."  People v. Guerra, 37 Cal.4th 1067, 1130 (2006) (citations omitted); see also Cal.

16   Penal Code § 261(a)(2).  "[T]o be found guilty of the crime of rape in concert, a defendant must

17   voluntarily acting in concert with another person, commit the crime of rape by force or violence and

18   against the will of the victim.  He may do so either personally or by aiding and abetting the other

19   person."  People v. Keovilayphone, 132 Cal.App.4th 491, 496 (2005) (citations and quotation marks

20   omitted).

21        The state court's determination was not unreasonable.  The testimony, as recounted in the

22   Court of Appeal opinion, demonstrated that Petitioner told May to have sex with Iron Man and that,

23   when she refused, Petitioner grabbed her arms and took her to a room with a bed in it.  After Iron

24   Man came into the room, Petitioner told them to hurry and left the room.  Scissors and Petitioner

25   then reentered the room and someone undressed May.  Scissors and Petitioner told Iron Man and

26   May to hurry and they left the room with May's clothes.  After Iron Man had forcible sex with May,

27   Petitioner reentered the room and took the sheet May was wrapped in.  007 then had forcible sex

28   with May.  The testimony further demonstrated that, after 007 finished sexually assaulting May,

1   Petitioner reentered the room naked with his penis erect.  He was sticking out his tongue and

2   wagging it at May.  Bolo grabbed her from behind.  Petitioner approached May and she bit him on

3   the shoulder.  Petitioner remarked that his penis had become "dead" and left the room.   Petitioner

4   later threatened to beat May up if she told anyone about what had happened at 007's house.

5        Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact

6   could have found Petitioner guilty of attempted rape.  Petitioner, after May was raped by Iron Man

7   and 007, entered the room naked with his penis erect and approached May who was being held from

8   behind by Bolo.  Petitioner only left the room after May bit him on the shoulder.  Similarly, a

9   rational trier of fact could have found Petitioner guilty of attempted rape in concert, as the sexual

10  assault was a group effort in which Petitioner took part by taking May to the room, taking her clothes

11  and the sheet she was wrapped in, and approaching her naked while Bolo held her from behind.

12      **C.  Ground Three**

13       Petitioner claims that *Apprendi v. New Jersey* requires that any fact which increases the

14  penalty for a crime must be submitted to a jury and proved beyond a reasonable doubt.  Petitioner

15  argues that his rights were therefore violated when he was sentenced to consecutive terms pursuant

16  to Penal Code section 667.6 despite the fact that the jury made no factual finding as to whether his

17  offenses were committed against separate victims or on separate occasions.[3]

18       This claim was presented in an appeal to the California Court of Appeal, which affirmed the

19  relevant portion of the judgment on November 24, 2003.  (Lodged Doc. 3.)  The issue was then

20  raised in a petition to the California Supreme Court, which summarily denied review.  (Lodged Docs.

21  4-5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have

22  denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v.

23  Nunnemaker, 501 U.S. 797, 803 (1991).

24       In rejecting Petitioner's claim, the Court of Appeal found that the findings necessary to

25  impose consecutive sentences were not elements of the substantive crimes and that they therefore did

26

27       [3] Petitioner identifies counts 44, 68, and 223 as the relevant counts for this claim.  (Petition, Ex. 1 at 11.)  His

28  conviction on count 68, however, was reversed on appeal.  (Lodged Doc. 3 at 41-43, 60).  The only remaining counts on
    which Petitioner received consecutive sentences, and which could therefore provide a basis for his *Apprendi* claim, are counts
    44 (rape in concert of May) and 223 (rape in concert of Pangnhia).  (Lodged Doc. 8; CT at 3784, 3806.)

1    not have to be submitted to a jury or proven beyond a reasonable doubt.  (Lodged Doc. 3 at 30-31.)

2         "Other than the fact of a prior conviction, any fact that increases the penalty for a crime

3    beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

4    reasonable doubt."  Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).  The Supreme Court,

5    however, has never held that *Apprendi* applies to factual findings used to impose consecutive

6    sentences.  Hong v. Sims, 221 Fed.Appx. 455, 457 (7th Cir. 2007) ("[T]he Supreme Court has never

7    held that *Apprendi* applies to factual findings used to impose consecutive sentences.  Indeed, we and

8    several other circuits have held that, so long as the sentence for each individual count does not

9    exceed its statutory maximum, a judge may impose consecutive sentences based on a fact not found

10   by the jury."); see also Oregon v. Ice, 128 S.Ct. 1657 (2008) (granting certiorari to consider whether

11   the Sixth Amendment, as construed in *Apprendi* and *Blakely*, requires that facts necessary to impose

12   consecutive sentences be found by the jury or admitted by defendant).

13        The state court's determination was therefore not contrary to, or an unreasonable application

14   of, clearly established Supreme Court law.  See Hong v. Sims, 221 Fed.Appx. 455, 457 (7th Cir.

15   2007) (holding that Illinois appellate court decision rejecting challenge to consecutive sentencing

16   based on judicial finding that defendant inflicted severe bodily injury was neither contrary to nor an

17   unreasonable application of *Apprendi* and *Blakely*).  Moreover, even if *Apprendi* applied to factual

18   findings used to impose consecutive sentences, Petitioner cannot demonstrate that his rights were

19   violated, as the jury found him guilty of rape in concert of May and of rape in concert of Pangnhia.

20   (CT at 3784, 3806, 3986, 4043).  These findings were sufficient to mandate the consecutive sentences

21   Petitioner received, without the need for any judicial factfinding, as they establish that the crimes

22   were committed against separate victims.  See Cal. Penal Code § 667.6(d) ("A full, separate, and

23   consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the

24   crimes involve separate victims or involve the same victim on separate occasions."); Cal. Penal Code

25   § 667.6(e)(3) (specifying that the section applies to rape in concert).

26        **D.  Ground Four**

27

28        Petitioner argues that he was denied his right to a fair trial by statements made by the

prosecutors to the jury during closing argument.  Petitioner acknowledges that no objections to the statements were made at trial, but he argues that the claims should be reviewed because counsel's failure to object constituted ineffective assistance.

This claim was presented in an appeal to the California Court of Appeal, which affirmed the relevant portion of the judgment on November 24, 2003.  (Lodged Doc. 3.)  The issue was then raised in a petition to the California Supreme Court, which summarily denied review.  (Lodged Docs. 4-5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that Petitioner's claims had been waived because he failed to interpose timely objections at trial.  The court further found that counsel's failure to make the objections did not demonstrate ineffective assistance because the prosecutors' comments were not prejudicial.  (Lodged Doc. 3 at 20-21.)

1. Procedural Default

A federal court will not review claims in a petition for writ of habeas corpus if the state court has denied relief on those claims on a state law ground that is independent of federal law and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  This doctrine of procedural default is based on the concerns of comity and federalism.  Id., at 730-32.

There are limitations as to when a federal court should invoke procedural default and refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.  Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).

If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice."  Noltie v. Peterson, 9 F.3d 802, 804-05 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

1    Here, citing to <u>People v. Green</u>, 27 Cal.3d 1, 27-28 (1980), the California Court of Appeal

2 found that Petitioner's claims had been waived because he failed to assert objections at trial.

3 (Lodged Doc. 3 at 20.)  The contemporaneous objection rule is independent of federal law and

4 adequate to support the judgment.  <u>See</u> <u>Vansickel v. White</u>, 166 F.3d 953, 957 (9th Cir. 1999)

5 (finding claim procedurally defaulted where defendant failed to timely object at trial); <u>Bonin v.</u>

6 <u>Calderon</u>, 59 F.3d 815, 843 (9th Cir. 1995) (finding claim procedurally barred where defendant

7 failed to object at trial).  Petitioner's claims are therefore procedurally defaulted unless he can

8 demonstrate cause for the default and actual prejudice or that the failure to consider his claims will

9 result in a fundamental miscarriage of justice.

10    2.  Cause and Prejudice

11    Petitioner argues that he has shown cause for the default, as his counsel's failure to object to

12 the prosecutors' remarks amounted to ineffective assistance.

13    Attorney error rising to the level of ineffective assistance of counsel may constitute cause to

14 excuse a procedural default.  <u>McCleskey v. Zant</u>, 499 U.S. 467, 494 (1991).  In a petition for writ of

15 habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.

16 <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir.

17 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing

18 that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

19 the Sixth Amendment.  <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's

20 representation fell below an objective standard of reasonableness, and must identify counsel's

21 alleged acts or omissions that were not the result of reasonable professional judgment considering

22 the circumstances.  <u>Id.</u> at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir.

23 1995).  Second, the petitioner must demonstrate that "there is a reasonable probability that, but for

24 counsel's unprofessional errors, the result ... would have been different."  <u>Strickland</u>, 466 U.S. at 694.

25    Petitioner first argues that his counsel was ineffective in failing to object when the

26 prosecutors misrepresented the standard of proof during closing argument with the following

27 statements:

28        But I can tell you one thing you can't base reasonable doubt on.  You cannot base it
         on speculation.  And I mean speculation about evidence that was not presented in this

courtroom or speculation about facts or inferences that can reasonably be drawn from the evidence presented in the courtroom.  If you can reasonably decide that fact C exists because you believe fact A and B existed and they contribute to fact A [sic], that's fine.  On the other hand if A and B exist and you agree on that, but you can't agree fact C exists, you can't use that to decide there's reasonable doubt.  (RT at 10561.)

You know, another thing is how amazing it is that in all these years that I've done trials at least one defense attorney has run into a juror who's had somewhat of a buyer's remorse.  You know, they run into this juror who says golly gee, about three weeks after I convicted this person, I voted for guilt, I have these nagging feelings.  You know, I don't know, what do these former jurors do, run around town and discuss about how awful their feelings were?  But that doesn't have any place in your decision-making.  That is an example to suggest to you that it has to be a certainty in your mind.  Well, of course you know that.  You don't need to be told or wonder what the motivation is or what the facts of that case.  That's a different case, different jury, has nothing to do with this trial.  (RT at 11314-15.)

Counsel was not ineffective in failing to object to these statements, as they only informed the jury that reasonable doubt could not be based on speculation and that the jury should focus on the facts in the present case.  Petitioner further argues, however, that his counsel was ineffective in failing to object when the prosecutors improperly suggested that the jury should reject defense arguments not echoed in the court's instructions.  The statements Petitioner claims are objectionable are as follows:

You will not get an instruction that says if you go with some strangers or some strange and some not so strange individuals to a mo[tel] that it's okay if you got raped.  You won't get such instructions.  (RT at 11301.)

Detective Olson testified that he was assigned at least a portion of this case in 1997.  1997.  Not 1998.  Not 1999.  And like Mr. Haas said, yeah, you know, this was a more or less directive, I guess, investigation where people actually go out and pursue the investigation.  They don't just sit back and wait for things to come to them.  There is no law against that.  You're not going to get an instruction that says if a detective goes out soliciting a witness, then distrust that information.  You're not going to get an instruction like that.  There is no law against that.  It's another smoke screen.  (RT at 11309-10.)

Counsel was not ineffective in failing to object to these statements, as they only emphasize that the jury should not automatically discredit information from a witness who was actively solicited by a detective or conclude that an individual consented to sex by going to a motel with strangers.  Petitioner also argues, however, that his counsel was ineffective in failing to object when the prosecutor "argued that the police and the victims in this case were 'not on trial,' and insinuated that

1   the defense was acting unfairly and unethically in attacking the witnesses' credibility or the police

2   techniques of investigation."  (Petition, Ex. 1 at 24.)  Petitioner does not identify any particular

3   statements made by the prosecutors in support of his claim and the citation to the record that is given

4   does not disclose any improper argument.  Petitioner has therefore failed to show that his counsel's

5   performance was deficient or that there was a reasonable probability of a different result if counsel

6   made timely objections.

7        Nor has Petitioner demonstrated the requisite prejudice necessary to excuse his default.

8   Petitioner must establish "not merely that the errors at his trial constituted a possibility of prejudice,

9   but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of

10  constitutional dimensions."  United States v. Frady, 456 U.S. 152, 170 (1982); Correll v. Stewart,

11  137 F.3d 1404, 1416 (9th Cir. 1998).  Petitioner has made no such showing as, in the words of the

12  Court of Appeal, any prejudicial effect of the prosecutors' statements "was undoubtedly minimal or

13  nonexistent."  (Lodged Doc. 3 at 20.)

14       3.  Fundamental Miscarriage of Justice

15       Finally, Petitioner does not argue, and he has not shown, that failing to consider his claims

16  would result in a fundamental miscarriage of justice.  His prosecutorial misconduct claims are

17  therefore procedurally defaulted.

18       **E.  Ground Five**

19       Petitioner argues that the use of CALJIC 2.90 violated his due process rights because it failed

20  to specify the proper degree of certainty for proof beyond a reasonable doubt.  The trial court

21  instructed the jury as follows:

22       A defendant in a criminal action is presumed to be innocent until the contrary is
         proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he
23       is entitled to a verdict of not guilty.  This presumption places upon the People the
         burden of proving him guilty beyond a reasonable doubt.  Reasonable doubt is defined
24       as follows: It is not mere possible doubt, because everything relating to human affairs
         is open to some possible or imaginary doubt.  It is that state of the case which, after
25       the entire comparison and consideration of all the evidence, leaves the minds of the
         jurors in that condition that they cannot say they feel an abiding conviction of the
26       truth of the charge.

27  (Lodged Doc. 2 at 11330.)  Petitioner claims that the term "abiding conviction" is insufficient to

28  convey the degree of certainty that is constitutionally required.

1      This claim was presented in an appeal to the California Court of Appeal, which affirmed the

2 relevant portion of the judgment on November 24, 2003.  (Lodged Doc. 3.)  The issue was then

3 raised in a petition to the California Supreme Court, which summarily denied review.  (Lodged Docs.

4 4-5.)  The California Supreme Court, by its "silent order" denying the petition, is presumed to have

5 denied the claims presented for the same reasons stated in the opinion of the lower court.  <u>Ylst v.</u>

6 <u>Nunnemaker</u>, 501 U.S. 797, 803 (1991).

7      In rejecting Petitioner's claim, the Court of Appeal noted that it had previously rejected the

8 same argument because there is no constitutional requirement to define "reasonable doubt" in any

9 specific manner, so long as the instructions as a whole convey the concept of the term.  (Lodged Doc.

10 3 at 24.)

11      "The beyond a reasonable doubt standard is a requirement of due process, but the

12 Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so

13 as a matter of course.  Indeed, so long as the court instructs the jury on the necessity that the

14 defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any

15 particular form of words be used in advising the jury of the government's burden of proof.  Rather,

16 taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the

17 jury."  <u>Victor v. Nebraska</u>, 511 U.S. 1, 5 (1994) (citations and quotation marks omitted).

18      The state court's determination was not unreasonable.  The trial court was not required to

19 give any particular definition of the term "reasonable doubt."  Further, the instructions taken as a

20 whole, correctly conveyed the concept of reasonable doubt to the jury.  <u>See</u> <u>Victor v. Nebraska</u>, 511

21 U.S. 1, 14-15 (1994) ("An instruction cast in terms of an abiding conviction as to guilt, without

22 reference to moral certainty, correctly states the government's burden of proof.");  <u>Lisenbee v. Henry</u>,

23 166 F.3d 997, 1000 (9th Cir. 1999) ("We therefore conclude that there is no reason to depart from

24 established precedent expressly affirming jury instructions cast in terms of an abiding conviction.").

25 **F.  Proper Respondent**

26      Petitioner states that he is currently incarcerated at Folsom Prison.  (Petition at 2.)

27 Respondent states that the warden of that institution is Matthew Kramer.  (Answer at n.1.)  Pursuant

28 to Rule 25 of the Federal Rules of Civil Procedure, the Clerk will be directed to substitute Matthew

1   Kramer as Respondent in this matter.

2                                          **RECOMMENDATION**

3          Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

4   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

5   Respondent.

6          This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

7   United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule

8   72-304 of the Local Rules of Practice for the United States District Court, Eastern District of

9   California.  Within thirty (30) days after being served with a copy, any party may file written

10  objections with the court and serve a copy on all parties.  Such a document should be captioned

11  "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall

12  be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

13  objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

14  636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

15  waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

16                                              **ORDER**

17         The Court HEREBY ORDERS that the Clerk of Court is DIRECTED to substitute Matthew

18  Kramer as Respondent in this matter.

19  <u>IT IS SO ORDERED.</u>

20

21  **Dated:      July 3, 2008**                          **/s/ John M. Dixon**
    9f4gk8                                      UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28